COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-06-128-CR

 

 

ERIC WILLIAMS                                                                   APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM
THE 367TH DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

In five issues, appellant
Eric Williams appeals his conviction for the capital murder of Chad Brooks (the
Adeceased@).  We affirm.

BACKGROUND








Appellant was charged with
committing capital murder by shooting the deceased with a firearm in the course
of committing or attempting to commit a robbery.[2]  He pled not guilty.  The jury found him guilty, the trial court
accepted the verdict, and Appellant received an automatic sentence of life
imprisonment. 

EVIDENCE

Appellant complains that the
evidence was legally and factually insufficient to convict him of capital
murder and that the trial court abused its discretion by admitting autopsy
photos into evidence.

Accomplice Testimony

In his third issue, Appellant
claims that there was insufficient independent evidence to corroborate the
accomplice testimony of Keith Weathersby and Kevin Lewis.[3]  Article 38.14 of the code of criminal
procedure provides that

[a] conviction cannot be had
upon the testimony of an accomplice unless corroborated by other evidence
tending to connect the defendant with the offense committed; and the
corroboration is not sufficient if it merely shows the commission of the
offense.








Tex. Code Crim. Proc.
Ann. art. 38.14 (Vernon 2005).  In conducting a sufficiency review under the
accomplice‑witness rule, we must eliminate the accomplice testimony from
consideration and then examine the remaining portions of the record to
ascertain if there is any evidence that tends to connect the accused with the
commission of the crime.  Solomon v.
State, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001); Hernandez v. State,
939 S.W.2d 173, 176 (Tex. Crim. App. 1997). 
ATendency to connect@ rather than rational sufficiency is the standard: the corroborating
evidence need not be sufficient by itself to establish guilt beyond a
reasonable doubt.  Solomon, 49
S.W.3d at 361; Cathey v. State, 992 S.W.2d 460, 462 (Tex. Crim. App.
1999), cert. denied, 528 U.S. 1082 (2000).  Nor is it necessary for the corroborating
evidence to directly link the accused to the commission of the offense.  Cathey, 992 S.W.2d at 462.  The accomplice‑witness rule, a
statutorily imposed sufficiency review, simply requires that there be other
evidence tending to connect the accused to the commission of the offense.  See id. at 462-63; see also Herron
v. State, 86 S.W.3d 621, 631‑33 (Tex. Crim. App. 2002). 

Corroborative Evidence

Appellant contends that the
eyewitness testimony of Shalonda and Shontell Jones was insufficient to
corroborate the accomplice testimony.








Shalonda[4]
testified that she had been staying with her sister, Shontell, and the deceased
in their one bedroom apartment.[5]  On April 28, 2003, Shalonda had been asleep
on a love seat, and the deceased had been asleep on the couch when Shontell
came home, around 11:30 p.m.  Shalonda
testified that all three were asleep when, around 1:30 a.m. on April 29, a loud
noise woke her, and three black males ran in, yelling, AKeep your head down,@ AWhere is the
stuff?@ and AWhere is the
shit at?@  She identified Keith and Kevin
as two of the men that entered the apartment that night from Exhibits 2 and 3,
and identified Appellant in court as the third man.  She testified that one of the men went to the
deceased, one went to her sister, and one went to her and that Kevin threw the
chenille throw blanket that she had been covered up with over her head, but
that she could still see because there were times that the blanket did not
cover her.








Shalonda testified that Keith
took Shontell into the kitchen and that when she heard the three gun shots, she
first thought, AOh, my God,
my sister=s dead, we=re going to die.@  She testified that at the time the shots were
fired, her sister was in the kitchen, the deceased was on the couch, and she
was on the love seat.  Shalonda testified
that she got a good look at Appellant when the blanket moved from the left side
of her face, stating, AI saw his
face and I thought it was the last face I=d see.@

Shontell, the deceased=s common law wife, testified that when she got home from work after 11
p.m., the deceased was asleep on the long couch, and her sister was asleep on
the love seat, and that she joined the deceased on the couch and went to sleep.  She testified that there was a loud noise,
and three black men came in, two of whom definitely had guns.  She testified that Appellant pointed a gun at
the deceased and shouted, AShow me where it is, where=s the money at, show me now.@  She identified Keith as the
man who held a gun on her and testified that she went into the kitchen with him
and that he told her to point Ato wherever it may be@ and then to get face down on the floor.  She testified that she thought they wanted Aweed.@  She testified that she heard him looking for
things in the cupboard and that then there was a bunch of noise in the living
room, followed by the three shots.








Dallas police homicide
detective Robert Ermatinger, the lead detective on the case, testified that he
showed Shalonda a six-photo lineup and that she identified Appellant as one of
the persons in the apartment.  He
testified that Shontell had not been shown a photo lineup of Appellant and that
she had identified Kevin from a photo lineup but that neither she nor Shalonda
were able to identify Keith from a photo lineup.

The paramedic who was at the
murder scene and the medical examiner both testified that the deceased suffered
multiple gunshot wounds.  Brook Reber,
Keith=s girlfriend, testified that she let Keith use her car on the evening
of April 28, 2003, that she received a phone call from Appellant the next day,
April 29, and that Appellant told her that she needed to report her car as
stolen.  She testified that he told her
that there were guns in the car with his fingerprints and that Keith had
nothing to worry about.  She identified
Exhibit 29, a burgundy-colored Impala, as a photograph of her car.








Dallas police officer Frank
Della identified Exhibit 29 as a photograph of the vehicle that he followed
after hearing the radio call about the shooting and the description of three
black males fleeing the scene.  He
testified that the vehicle=s rear license plate was covered and that when he initiated his lights
to make a traffic stop, the vehicle led him on a high-speed chase.  He and Dallas police officer Byron Guynn, who
provided back‑up in another vehicle, both testified about the high-speed
chase and that one passenger, later identified as Keith, exited the moving
vehicle, that they caught the front passenger after the vehicle high‑sided
a curb, and that the driver escaped.  The
Tulsa police officer who served Appellant with a capital murder warrant a year
later in Tulsa, Oklahoma, testified that Appellant was going by a different
name and had several other aliases linked to him.  The mother of Appellant=s children, Daphanie Moore, and Appellant=s aunt both testified that Appellant, Daphanie, and the children went
to Tulsa, Oklahoma, to visit family, on April 29 or April 30, 2003.

Kevin=s mother testified that Appellant told her that Athe reason they didn=t catch [him was] because [he] was hiding in the bushes for three
hours@ and that Kevin did not do anything. 
She testified that she understood Appellant to mean that he had shot and
killed the deceased when he said, AI had to do what I had to do,@ and that when her son called her from the jail, he told her that he
had been charged Awith capital
murder, something that he didn=t do@ and that he
had told her that someone had been shot and killed.  She testified that Appellant told her that if
Kevin Awould take the wrap [sic], he would get him a lawyer@ and that Ahe would
take care of Kevin if he would just take the blame.@








Officer Guynn inventoried the
vehicle at the arrest scene and testified that he found two nine-millimeter
semi-automatic pistols inside and secured them in his vehicle without wearing
gloves.  The State=s firearms examiner testified that the three fired cartridge cases
discovered at the murder scene were fired from one of the pistols recovered
from the vehicle.  The guns were swabbed
for DNA and processed for fingerprints, but the only fingerprint salvaged was
Officer Guynn=s.  Handwashings taken from Keith and Kevin
tended to indicate that they did not fire a weapon.

The State=s forensic biologist testified that DNA material gathered from the
grip and trigger of the murder weapon did not constitute good samples from
which he could get a complete DNA profile. 
He performed a comparison between the samples from the murder weapon and
the genetic profiles generated by buccal swabs provided by Keith, Kevin, and
Appellant and testified that, from the comparison, he could include Appellant
as a possible source of the DNA obtained from the sample taken from the trigger,
exclude him as a source of DNA obtained from the gun=s grip, and exclude Kevin and Keith as sources of DNA obtained from
either of the items.  He testified that a
second test run by a different lab showed that it was possible that Appellant
could have left DNA on the grip.  The
defense expert testified that, with regard to the second lab=s results on the gun=s grip, AI wouldn=t even say that IdentiGene included anybody, honestly,@ and that the second lab=s results indicated, with regard to the DNA sample, that either Aa lot of people handled that gun. 
Because there=s a lot of
alleles that, again, represent like it was handed around at a party,@ or that there was a serious mishandling of the evidence.








Having eliminated the
accomplices= testimony
from our consideration and examined the remaining portions of the record, we
conclude that there was  evidence other
than the accomplices= testimony
that tended to connect Appellant with the commission of capital murder.  See Solomon, 49 S.W.3d at 361.  Even though Shalonda and Shontell did not see
Appellant shoot the deceased, their description of the positioning of the three
black males in the apartmentCthat Appellant stood near the deceased, had his gun on the deceased,
and demanded money or drugsCas well as Appellant=s flight and escape, the testimony by Brook and Kevin=s mother, other trial testimony, and the physical evidence, all tend
to connect Appellant to the capital murder. 
See Cathey, 992 S.W.2d at 462-63. 
Therefore, we overrule Appellant=s third issue.

Legal & Factual Sufficiency

In his fourth issue,
Appellant asserts that the evidence was legally and  factually insufficient because Ano one credibly placed [Appellant] at the crime scene,@ forensic evidence did not link him to the crime scene, and the DNA
evidence was inconclusive.  In his fifth
issue, he complains that a rational jury would not have convicted him.

Standard Of Review








In reviewing the legal
sufficiency of the evidence to support a conviction, we view all the evidence
in the light most favorable to the verdict in order to determine whether any
rational trier of fact could have found the essential elements of the crime beyond
a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton v.
State, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).  This standard gives full play to the
responsibility of the trier of fact to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts.  Jackson, 443 U.S.
at 319, 99 S. Ct. at 2789.  The trier of
fact is the sole judge of the weight and credibility of the evidence.  See Tex.
Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v. State,
34 S.W.3d 912, 919 (Tex. Crim. App. 2000). 
Thus, when performing a legal sufficiency review, we may not re‑evaluate
the weight and credibility of the evidence and substitute our judgment for that
of the fact‑finder.  Dewberry v.
State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied, 529
U.S. 1131 (2000).  We must resolve any
inconsistencies in the evidence in favor of the verdict.  Curry v. State, 30 S.W.3d 394, 406
(Tex. Crim. App. 2000).  We must consider
all the evidence admitted at trial, even improperly admitted evidence, when
performing a legal sufficiency review.  Moff
v. State, 131 S.W.3d 485, 489‑90 (Tex. Crim. App. 2004).








When reviewing the factual
sufficiency of the evidence to support a conviction, we view all the evidence
in a neutral light, favoring neither party. 
Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); Drichas
v. State, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting
the conviction, although legally sufficient, is nevertheless so weak that the
fact‑finder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
fact‑finder=s
determination is manifestly unjust.  Watson,
204 S.W.3d at 414‑15, 417; Johnson v. State, 23 S.W.3d 1, 11 (Tex.
Crim. App. 2000).  To reverse under the
second ground, we must determine, with some objective basis in the record, that
the great weight and preponderance of all the evidence, though legally
sufficient, contradicts the verdict.  Watson,
204 S.W.3d at 417.








In determining whether the
evidence is factually insufficient to support a conviction that is nevertheless
supported by legally sufficient evidence, it is not enough that this court Aharbor a subjective level of reasonable doubt to overturn [the]
conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s resolution of a conflict in the evidence.  Id. 
We may not simply substitute our judgment for the fact‑finder=s.  Johnson, 23 S.W.3d at
12; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s determination of the weight to be given contradictory testimonial
evidence because resolution of the conflict Aoften turns on an evaluation of credibility and demeanor, and those
jurors were in attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at
8.  Thus, we must give due deference to
the fact‑finder=s
determinations, Aparticularly
those determinations concerning the weight and credibility of the evidence.@  Id. at 9.

Accomplices= Testimony

Keith admitted that he was
the person in Exhibit 2 and identified Kevin in Exhibit 3.  He testified that he drove Brook=s car on April 28 and that Exhibit 29 was a photograph of Brook=s car.  He testified that he was
present when the deceased was murdered and about events leading up to the
shooting: that he, Appellant, Kevin, and Jason Collins waited at a Whataburger
to get some drugs from a Mexican guy and that when the Mexican did not show up,
they decided to go to the deceased=s apartment for some marijuana and ecstasy.  He testified that it was Jason=s idea to go to the deceased=s apartment, that Jason drove his own car to the apartment, and that
Appellant rode with Jason.[6]













Keith testified that he,
Appellant, and Kevin went into the deceased=s apartment and that Appellant stood in front of the couch the
deceased was on and had a gun in his hand. 
He testified that there were two girls in the apartment and that one of
them went into the kitchen with him; he got a box from the cabinet above the
sink, and around the same time as he went into the box, he heard three or four
shots fired and ran out the door.  He
testified that he, Appellant, and Kevin fled in Brook=s car and that Appellant drove.  Keith testified that Appellant had fired the
shots and that when he asked Appellant why he had done it, A[Appellant] said he had to do it.@  Keith further testified that
he jumped out while the car was going 35 to 40 miles per hour and started
running for home; he was arrested later that evening.  He also testified that he was not on his
medication when he was arrested and Awas not in [his] right mind.@

Keith testified that he did
not have a gun that night, that Appellant had a gun, and that there was also a
gun in the trunk of the car.  He
testified that he did not order anybody to go into the kitchen or do anything
else and that he did not take anything. 
His agreement with the district attorney=s office was entered into evidence, as were certified copies of his
prior criminal convictions. 

Kevin identified himself in
Exhibit 3, Keith in Exhibit 2, and the vehicle in Exhibit 29 as the car in
which they fled the scene.  He testified
that he and Appellant got into Jason=s car, met Keith, and went to a Whataburger to do a drug deal.  When the dealer did not show up, they went to
the deceased=s
apartment.  He testified that all four
men rode in Brook=s car, that
he, Appellant, and Keith went into the apartment, and that Jason stayed with
the car.








Kevin testified that
Appellant knocked on the door twice, pulled out his gun, kicked the door, and
started yelling and screaming and that there were two girls screaming.  He further testified that Appellant yelled, AGet the shit, just get the shit,@ and put his knees to the deceased=s back.  He testified that the
deceased was on the Along three‑seated
couch@ when they first entered the apartment, and the two girls were on the Atwo‑seater couch.@  He testified that he stood in
front of the coffee table and that Keith went to the kitchen with one of the
girls.  He also testified that both girls
pointed to the entertainment system, to a box sitting there that contained
money and drugs, but he later stated that it was just one of the girls, because
the other was in the kitchen with Keith. 
Kevin testified that when he was almost at the door, he heard three
gunshots and that Appellant was behind him with the deceased when he heard the
gunshots.  He testified that he gave the
money and drugs to Appellant, that Appellant drove from the scene, and that
when he got out of the car and started running, he was caught immediately by
the police.  Kevin testified that he and
Appellant smoked marijuana before going to the deceased=s apartment.

Kevin testified that
Appellant was the only one with a gun and that there were no other guns in the
car.  He testified that Shalonda did not
have a blanket over her head, although she did have a blanket, and that he did
not point a gun to her head or force her head down.  His agreement with the district attorney=s office was entered into evidence, as were certified copies of his
prior criminal convictions.

Other Evidence








Shalonda testified that when
the gunshots were fired, she ran to the kitchen to find her sister and saw the
deceased to the right in the doorway, with the bottom half of his body in the
apartment and the top half‑in and half‑out of the apartment,
bleeding.  She continued to look for
Shontell, who was not in the kitchen; she found Shontell when she came back
around through the living room and saw her sister coming from the back of the
apartment.  Shalonda testified that their
phone was broken and they could not get it back together, so she and Shontell
split up and knocked on neighbors= doors to find someone to call the police.

Shontell testified that after
she heard the shots, she ran through the kitchen and then through the bedroom
to the patio area, where she saw a newer Taurus‑type vehicle with its
license plate covered driving away.  She
then ran back through the bedroom and the kitchen and found the deceased in the
doorway, lying on his side, his shirt bloody and blood coming out of his
mouth.  She testified that she called 911
using the phone that was beside him, which she had to put back together, called
his parents, and then started running around to her neighbors for help.  She testified that the neighbors told her
that they had called the police when they heard the shots, that it was Amaybe five minutes until the ambulance got there,@ and that the police arrived right after the paramedics.








Shalonda testified that the
three men were in the apartment about two or three minutes.  Shontell testified that they were in the
apartment approximately three minutes. 
Keith testified that they were not in the deceased=s apartment for very long, only Aa couple of minutes.@  Kevin testified that it Awas a few minutes maybe@ and was pretty quick and chaotic. 
The paramedic testified that the call came in at 1:34 a.m. on April 29
and it was for gunshot wounds, that the first documented vital sign was at 1:44
a.m., that the patient was on the front porch area, and that there were no
signs of life.  The Dallas police officer
who was dispatched to the apartment testified that he secured the scene, made
sure an ambulance was en route, got information on the suspects, and broadcast
it.  He testified that the deceased was
still alive when he arrived.  The
firearms examiner testified that, based on her analysis, there were two contact‑range
discharges and one from at least two feet away. 
The medical examiner=s testimony confirmed that there had been two contact wounds and one
from at least one foot away.








Detective Junius Rucker, Sr.,
testified that he processed the crime scene, arriving at close to 2:00 a.m. on
April 29.  He testified that he
photographed everything, including the three shell casings, one bullet
fragment, and one copper casing and that Exhibit 76 showed a fired casing that
he found on the sofa.  He testified that
he did not get any latent prints off the casing.  Detective Rucker testified that marijuana was
found in the kitchen and in two baggies in the living room by the stereo and
that he processed the following for fingerprints: the lamp in the living room,
front door, rear doors, coffee table, sofa, kitchen cabinet, countertop, empty
scale box, two metal weights, plastic baby bottle, three spent metal casings,
and a metal container but that he did not collect anything for DNA.  He testified that the front door had been
kicked in, based on damage to the front door and the fact that Ayou could tell where it was kicked from, but you couldn=t see any detail in the print itself.@

Kevin=s mother testified that when Appellant told her that Kevin was in the
wrong place at the wrong time, A[H]e said, I did it all by myself, he said, because I have to do what
I have to do.  He said, my wife=s just had a baby.  I have
another babyC . . . .@

Daphanie testified that in
April 2003, she and Appellant had a child that was two months old and another
that was one year old.  She testified
that on April 28, 2003, she and Appellant stayed home and watched television,
had pork chops for dinner, and then put the children to bed and went to sleep
together.  She testified that the phone
rang early the next morning, that Jason was the caller, and that he asked to
speak to Appellant.  She testified that
they rented a car on April 29 to drive to Tulsa, Oklahoma, to visit Appellant=s family and stayed there for around three months.  She testified that they left around mid‑week
and that she had not planned on moving at the time they left.








Daphanie testified that
Appellant did not work when they lived together and that he did not have any
money unless she gave it to him or he got the money from somewhere else.  She testified that she did not know Shalonda
or Shontell Jones, Kevin Lewis, or the deceased, but that she did know Keith
and Jason.  She testified that she did
not know that Appellant was wanted for capital murder until a year later, when
he was arrested in April 2004, that she was with Appellant all day on April 29,
and that he did not call Brook or come into contact with Mildred Lewis that
day.  She testified that she never
contacted the district attorney=s office or the police to tell them that Appellant did not commit the
crime.  Detective Ermatinger testified
that it took a year to serve Appellant with the arrest warrant and that
Appellant was arrested in Tulsa, Oklahoma.








Both Shontell and Shalonda
testified that Keith wore a red shirt the night he was in the apartment.  However, Officers Della and Guynn testified
that the driver of the vehicle wore a red jersey, and Keith testified that
Appellant was the driver.  Keith
testified that when the police caught him, he was in a white tank top and
boxers because his pants came down while he was running and he stepped out of
them and kept going.  He testified that
his hair had been in braids earlier, but when the police caught him, he had
taken the braids out. Officer Della confirmed this, testifying that when he saw
Keith bailing out of the car, he was wearing baggy white shorts, a white tank
top, and had a cornrow hairstyle, and when he saw him later, at 5:00 a.m., he
had longer hair and was wearing boxer shorts.

The DNA evidence at trial was
not conclusive due to the poor samples obtained.  It tended to indicate that Appellant could
have deposited DNA on the murder weapon=s trigger, but excluded him from depositing the DNA on the weapon=s grip.  The sample excluded
both Kevin and Keith.  Jason was not
asked to provide DNA and was not compared against the samples.  Jason could not be located at the time of the
trial.  Appellant=s court-appointed investigator testified about his attempts to find
Jason and stated that, in his opinion, Jason was avoiding service.








The jury heard testimony from
the two eyewitnesses and two accomplices that Appellant held a gun on the
deceased and demanded money or drugs. 
The jury also heard testimony from Brook and Kevin=s mother that placed Appellant at the crime scene and in the vehicle
used to flee the scene.  Keith testified
that Appellant fired the shots and that Appellant later told him that he had to
do it.  Kevin testified that Appellant
was behind him with the deceased when he heard the gunshots.  The medical examiner testified that the
deceased died from gunshot wounds. 
Viewing all the evidence in the light most favorable to the verdict, we
conclude that the jury could have found beyond a reasonable doubt that
Appellant intentionally or knowingly caused the deceased=s death in the course of committing or attempting to commit a
robbery.  See Tex. Penal Code Ann. '' 19.02(b)(1), 19.03(a)(2); Jackson, 443 U.S. at 319, 99 S. Ct.
at 2789; Hampton, 165 S.W.3d at 693.

Viewing the evidence in a
neutral light and giving due deference to the jury=s determination of the weight to be given contradictory testimonial
evidence, the evidence was sufficient, even without the DNA evidence, to
support the jury=s conclusion
that Appellant committed capital murder. 
See Watson, 204 S.W.3d at 414. 
The jury had the opportunity to observe and evaluate the witnesses= credibility and demeanor and to weigh the evidence presented to them
by the State and Appellant=s witnesses.[7]  See Johnson, 23 S.W.3d at 8.  Having reviewed the entire record, we cannot
say that the evidence is so weak that the jury=s determination was clearly wrong and manifestly unjust or that
conflicting evidence so greatly outweighed the evidence supporting the
conviction that the jury=s
determination was manifestly unjust.  See
Watson, 204 S.W.3d at 414‑15, 417; Johnson, 23 S.W.3d at
11.  We overrule Appellant=s fourth and fifth issues.








ADMISSION OF EVIDENCE

In his first two issues,
Appellant complains that the autopsy photos were not relevant and that their
admission was more prejudicial than probative. 
Of the State=s
photographic exhibits that he objected to at trial,[8]
Appellant now asserts that Exhibits 50, 52, 54, and 57 through 66 are Aunobjectionable;@  therefore, we will only address Exhibits 38,
39, 40, 41, 44, 47, 55, and 56.

Standard Of Review








We review a trial court=s decision to admit evidence under an abuse of discretion
standard.  Green v. State, 934
S.W.2d 92, 101‑02 (Tex. Crim. App. 1996) cert. denied, 520 U.S.
1200 (1997); Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App.
1991) (op. on reh=g).  As long as the trial court=s ruling falls within the zone of reasonable disagreement, we will
affirm its decision.  Moses v. State,
105 S.W.3d 622, 627 (Tex. Crim. App. 2003). 
The trial court=s decision
must be reasonable in view of all the relevant facts.  Santellan v. State, 939 S.W.2d 155,
169 (Tex. Crim. App. 1997).  The mere
fact that a trial court may decide a matter within its discretionary authority
in a different manner than an appellate court would in a similar circumstance
does not demonstrate that an abuse of discretion has occurred.  Manning v. State, 114 S.W.3d 922, 926
(Tex. Crim. App. 2003).

Exhibits 38, 39, 40, 41, 44, 47, 55,
& 56

During trial, the State
sought to admit Exhibits 37 through 67, photographs taken during the deceased=s autopsy.  Appellant objected
to all of them and requested a rule 403 hearing, arguing that he did not Areally see how the relevance substantially outweighs [the photographs=] prejudicial effect@ because cause of death Areally isn=t disputed
in this case.@  The State withdrew Exhibits 37, 42, 43, 45,
46, 48, 49, 51, and 53, and Appellant objected to all of the remaining
exhibits, complaining that they were prejudicial and Ahave very low relevance and very high prejudicial effect.@  The trial court overruled this
objection.  It admitted all of the
remaining exhibits except Exhibit 67.

Preservation Of Error








In his first issue, Appellant
complains that the autopsy photos were neither relevant nor necessary to assist
the medical examiner in describing the cause of death or any issue related to
Appellant=s guilt or
innocence.  To preserve a complaint for
our review, a party must have presented to the trial court a timely request,
objection, or motion that states the specific grounds for the desired ruling if
they are not apparent from the context of the request, objection, or
motion.  Tex. R. Evid. 103(a); Tex.
R. App. P. 33.1(a)(1); Mosley v. State, 983 S.W.2d 249, 265 (Tex.
Crim. App. 1998) (op. on reh=g), cert. denied, 526 U.S. 1070 (1999).  Further, the trial court must have ruled on
the request, objection, or motion, either expressly or implicitly, or the
complaining party must have objected to the trial court=s refusal to rule.  Tex. R. App. P. 33.1(a)(2); Mendez
v. State, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004); Gutierrez v. State,
36 S.W.3d 509, 510‑11 (Tex. Crim. App. 2001); Darty v. State, 709
S.W.2d 652, 655 (Tex. Crim. App. 1986). 

During trial, Appellant
objected that the prejudice of the photographic exhibits substantially
outweighed their relevance, a proper rule 403 objection, but he did not object
to the relevance of the exhibits themselves, other than to state that the
exhibits had Avery low
relevance.@  Appellant did not object to the trial court
that the exhibits lacked any probative value under rule 401, that is, that they
were not relevant at all, as he now contends on appeal.  Therefore, he has failed to preserve this
complaint for our review.  Tex. R. Evid. 103(a), 401; Tex. R. App. P. 33.1(a)(1)-(2); Mendez,
138 S.W.3d at 341; Mosley, 983 S.W.2d at 265.  We overrule Appellant=s first issue.

Medical Examiner=s Testimony & Rule 403








Dr. William Rohr, M.D., the
medical examiner, testified that he performed a forensic autopsy on the
deceased.  Twenty-one photos related to
the autopsy were admitted into evidence; eleven pertained to the deceased=s corpse.  Dr. Rohr testified
that, based on his training and experience and the autopsy, the cause of death
was multiple gunshot wounds and the manner of death was a homicide.

Dr. Rohr labeled the three
gunshot wounds as #1, #2, and #3, and discussed each.[9]  He testified that based on his examination of
the clothing that the deceased had worn and gunshot wound #1, the right
shoulder gunshot wound, A[t]he muzzle
of the gun was up against the clothing, pressed against the skin,@ because of soot and gunpowder inside the wound at the entry site and
the holes in the clothing.  He testified
that gunshot wound #2, from the bullet that entered through the deceased=s lower left back and exited from his lower left chest, was also a
contact wound.  He testified that soot
inside the wound meant that Athe muzzle of the gun was placed directly up against the skin.@  He testified that gunshot
wound #3, from the bullet that entered the deceased=s lower right back and exited on the left, was probably from at least
a foot away and caused significant damageCit Aliterally
[broke] the right kidney in half,@ severed the renal artery, and went through the stomach and the left
lobe of the liver before exiting through the chest wall.








Dr. Rohr testified that
Exhibit 38, a photograph of the side of the deceased=s face, showed a small abrasion on his eyebrow that the deceased could
have sustained from falling down and that Exhibit 39, a photograph of the
deceased=s neck and chest, showed abrading on the left side sustained at or
near death. He testified that Exhibit 40, a photograph of the back of the
deceased=s naked body on the autopsy table, was Aa routine photograph without clothing,@ a photograph Aroutinely
taken in all homicides of the back@ and displayed the entry wounds of gunshot wounds #2 and #3.  Dr. Rohr testified that Exhibit 41, a
photograph of the front of the deceased=s naked body on the autopsy table, was also Aa routine photograph of the upper half of the deceased@ and displayed the exit wounds of gunshot wounds #1 and #3.  He testified that the chest tubes had been
left in place Amainly to
kind of make the photograph as clear as possible.@








Dr. Rohr testified that
Exhibit 44, a close up of the entry wound of gunshot wound #1 in the deceased=s shoulder, showed soot Ain the wound and at the edges@ and an abrasion where the gun=s muzzle had been.  He testified
that Exhibit 47, another closeup, showed the entry wound of gunshot wound #2,
the muzzle imprint and a patch of soot. 
Dr. Rohr testified about Exhibit 55, a photograph of the deceased=s kidney, stating, AYou can see, as I described before, it=s broken in half by the bullet, and that=s from Gunshot Wound [#]3 here.@  He testified that Exhibit 56,
a photograph of the deceased=s liver, showed the bottom side of the liver and Awhere the bullet has come and gone through the left lobe here . . .
before going through the chest wall.@








The admissibility of a
photograph is within the trial court=s sound discretion.  Paredes
v. State, 129 S.W.3d 530, 539 (Tex. Crim. App. 2004).  We will not disturb a trial court=s ruling admitting evidence so long as its decision falls within the Azone of reasonable disagreement.@  See Montgomery, 810
S.W.2d at 391.  Under rule 403, relevant
evidence may be excluded if its probative value is substantially outweighed by
the danger of unfair prejudice.  Tex. R. Evid. 403.  A rule 403 analysis by the trial court should
include, but is not limited to, the following considerations: (1) the probative
value of the evidence; (2) the potential to impress the jury in some
irrational, yet indelible, way; (3) the time needed to develop the evidence;
and (4) the proponent=s need for
the evidence.  Erazo v. State, 144
S.W.3d 487, 489 (Tex. Crim. App. 2004). 
Here, after reducing the number of photographs sought to be admitted,
the State established on voir dire with Dr. Rohr that the photographs would
help him to describe the gunshot wounds and, aside from cause of death, would
help the jury understand what condition the deceased arrived in, the range of
fire of the wounds, what the wounds looked like, and Ahow [the gunshots] destroyed the kidney and the damage that was done
to the liver.@  Appellant argued that because Dr. Rohr
testified that he could explain the cause of death and where the gunshots went
in and out without the photographs or his diagram, the remaining photos were
highly prejudicial.

A court may consider the
following nonexclusive factors in determining whether the probative value of a
photograph is substantially outweighed by the danger of unfair prejudice: the
number of photographs, their gruesomeness, their detail, their size, whether
they are black and white or color, whether they are close‑up shots,
whether the body is naked or clothed, whether the body has been altered by
autopsy, the availability of other means of proof, and other circumstances
unique to the individual case.  Erazo,
144 S.W.3d at 489; Reese v. State, 33 S.W.3d 238, 241 (Tex. Crim. App.
2000); King v. State, 189 S.W.3d 347, 355 (Tex. App.CFort Worth 2006, no pet.). 
Appellant complains of eight photographs.  These were all color photographs.  Two of the photographs showed the deceased=s face and upper chest, two showed the deceased=s naked body, two showed gunshot wounds close-up, one showed the
deceased=s kidney, and one showed the deceased=s liver.








Autopsy photographs are
generally admissible unless they depict mutilation caused by the autopsy
itself.  Rayford v. State, 125
S.W.3d 521, 529 (Tex. Crim. App. 2003), cert. denied, 543 U.S. 823
(2004).  Where pictorial evidence will
help the jury to understand verbal testimony, such as the technical language
used by a medical doctor in describing the injuries sustained by a crime
victim, the photograph is generally admissible. 
Harris v. State, 661 S.W.2d 106, 107 (Tex. Crim. App. 1983).  Photographs that depict the nature, location,
and extent of a wound have been declared probative enough to outweigh any
prejudicial effect.  Frank v. State,
183 S.W.3d 63, 77‑78 (Tex. App.CFort Worth 2005, pet. ref=d); Legate v. State, 52 S.W.3d 797, 807 (Tex. App.CSan Antonio 2001, pet. ref=d).  Overall, the photograph
must be helpful to the jury; A[i]f there are elements of a photograph that are genuinely helpful to
the jury in making its decision, the photograph is inadmissible only if the
emotional and prejudicial aspects substantially outweigh the helpful aspects.@  Erazo, 144 S.W.3d at
491‑92.








Dr. Rohr stated that the
autopsy photographs would help the jury understand in what condition the
deceased arrived.  Exhibits 38 and 39
show abrasions to the deceased=s face and upper chest sustained before death, but are not
particularly gruesome.  We cannot see,
based on the record, and Appellant does not explain, how the probative value of
Exhibits 38 and 39 in demonstrating the deceased=s condition and the nature, location, and extent of minor wounds
sustained at or near the time of death was substantially outweighed by
prejudice.[10]  See Frank, 183 S.W.3d at 78‑79.  Therefore, we conclude that the trial court
did not abuse its discretion in admitting these two exhibits.  See Paredes, 129 S.W.3d at 539.  Likewise, Appellant does not discuss how the
probative value of Exhibits 44 and 47, each showing a close-up of an entry
wound, soot, and the muzzle imprint of the weapon used, were substantially
outweighed by prejudice, particularly in light of Dr. Rohr=s testimony that the presence of soot and muzzle imprints explained
his conclusion that those two wounds were contact wounds.  See id.  The presence of contact wounds was
significant in light of the testimony by Shalonda, Shontell, and the
accomplices with regard to Appellant=s position near the deceased in the apartment.








Exhibits 40 and 41 depicted
Appellant=s naked body
on the autopsy table, with the clear autopsy tubes visible.  Dr. Rohr testified that Exhibit 40 displayed
the entry wounds of gunshot wounds #2 and #3 and that Exhibit 41displayed the
exit wounds of gunshot wounds #1 and #3. 
Other than the presence of the clear tubing, there was no mutilation
caused by the autopsy itself.  See
Rayford, 125 S.W.3d at 529.  These
exhibits depicted the nature, location, and extent of the gunshot wounds
inflicted upon the deceased.  See
Frank, 183 S.W.3d at 78‑79. 
Dr. Rohr testified, when asked why he considered this a homicide and not
an accident, A[F]or one
thing, there was more than one gunshot wound; there=s three.  And they=re on the back.  And it would be
difficult to say that this was accidentally done.@  One element that the State had
to prove was that the deceased=s death had been intentionally caused. 
See Tex. Penal Code Ann. '' 19.02(b)(1), 19.03(a)(2).

Appellant complains that the
photographs were not helpful to explain the entrance and exit wounds, stating, ADr. Rohr admitted when he described them[,] >Entry Wound [#]1 can barely be seen over on the shoulder here,= . . . >barely see
the exit for [#]1,= [and] . . .
>barely see the exit for [#]2 here.=@ However Dr. Rohr also testified that, with regard to Exhibit 40, Ait displays the Entry Wound [#]3 here, the Entry Wound [#]2 here,@ and Awe can see
the exit for [#]1 clearly right here@ as well as the exit for gunshot wound #3.








Although gruesome, Exhibits
40 and 41 depicted the reality of the offense and were probative of at least
one element of the State=s case.  See Erazo, 144 S.W.3d at 491‑92;
see also Chamberlain v. State, 998 S.W.2d 230, 232, 237 (Tex. Crim. App.
1999) (AVisual evidence accompanying testimony is most persuasive and often
gives the fact finder a point of comparison against which to test the
credibility of a witness and the validity of his conclusions.@), cert. denied, 528 U.S. 1082 (2000).  Therefore, we cannot say that the trial court
abused its discretion by deciding that the probative value of Exhibits 40 and
41were not substantially outweighed by the danger of unfair prejudice. 

However, with regard to
Exhibits 55 and 56, photographs of the deceased=s liver and kidney, we agree with Appellant that these two photographs
were substantially more prejudicial than probative, and should not have been
admitted.  Dr. Rohr explained to the
trial court that the two photographs were useful to demonstrate Ahow [the gunshots] destroyed the kidney and the damage that was done
to the liver.@  He testified before the jury that the third
gunshot broke the right kidney in half and severed the renal artery, but did
not describe how this damage led to the deceased=s demise.  We conclude that this
evidence was substantially more prejudicial than probative because showing the
jury photographs of the deceased=s internal organs, by themselves, without additional testimony, did
nothing to depict the nature or location of the wound or to help the jury make
its decision on an element of the charged offense when they had already seen
the body and positioning of the gunshot wounds and heard Dr. Rohr=s testimony that the cause of death was multiple gunshot wounds.  See Erazo, 144 S.W.3d at 491‑92;
Frank, 183 S.W.3d at 77‑78.

 








Harm Analysis

Having found error with
regard to the admission of Exhibits 55 and 56, we must conduct a harm analysis
to determine whether the error calls for reversal of the judgment.  Tex.
R. App. P. 44.2.  We apply rule
44.2(b) to the erroneous admission of evidence and disregard the error if it
did not affect Appellant=s
substantial rights.  Tex. R. App. P. 44.2(b); see Mosley,
983 S.W.2d at 259; Coggeshall v. State, 961 S.W.2d 639, 642‑43
(Tex. App.CFort Worth
1998, pet. ref=d); see
also Solomon, 49 S.W.3d at 365 (A[S]ubstantial rights are not affected by the erroneous admission of
evidence >if the
appellate court, after examining the record as a whole, has fair assurance that
the error did not influence the jury, or had but a slight effect.=@).  A substantial right is
affected when the error had a substantial and injurious effect or influence in
determining the jury=s
verdict.  King v. State, 953
S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing Kotteakos v. United States,
328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); Coggeshall, 961 S.W.2d
at 643.  In making this determination, we
review the record as a whole.  See
Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).








We have already examined the
record for legal and factual sufficiency and concluded that there was
sufficient evidence to convict Appellant of capital murder based on the witness
and accomplice testimony discussed above and Dr. Rohr=s testimony that the deceased=s cause of death was a homicide, caused by three gunshot wounds.  Exhibits 55 and 56 were merely cumulative, as
Dr. Rohr had already explained to the jury that gunshot #3 had broken the right
kidney in half and struck the left lobe of the liver before the photographs of
the violated organs were shown to the jury. 
See Long v. State, 203 S.W.3d 352, 353 (Tex. Crim. App.
2006).  We conclude that, in the context
of the entire case against Appellant, the trial court=s error in admitting Exhibits 55 and 56 did not have a substantial or
injurious effect on the jury=s verdict and did not affect Appellant=s substantial rights.  See
King, 953 S.W.2d at 271.  Thus, we
disregard the error.  See Tex. R. App. P. 44.2(b).  We overrule Appellant=s second issue.

CONCLUSION

Having overruled all of
Appellant=s issues, we
affirm the trial court=s judgment.

 

 

DIXON W. HOLMAN

JUSTICE

 

PANEL
A:  CAYCE, C.J.; HOLMAN AND MCCOY, JJ.

 

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

 








DELIVERED:  August 9, 2007











[1]See Tex.
R. App. P. 47.4.





[2]See Tex.
Penal Code Ann. '' 19.02(b)(1), 19.03(a)(2) (Vernon
2005 & Supp. 2006). 





[3]A co‑indictee for the same
offense is an accomplice as a matter of law. 
Burns v. State, 703 S.W.2d 649, 651 (Tex. Crim. App. 1985).  Both Keith and Kevin were charged with this
capital murder.





[4]Shalonda Jones is also referred to
in the testimony as AShea,@ her nickname.  Shontell Jones is also referred to in the
testimony as ANicole.@





[5]The deceased=s apartment is situated within the
portion of the City of Dallas located within Denton County.





[6]Shalonda testified that Jason was a
drug user and dealer and that she lived with him for several years before
moving in with her sister and the deceased. She testified that the deceased had
also sold drugs and that there were drugs in the apartmentCmarijuana and ecstasy.  She testified that she did not see Jason that
night and described him as a white male, around six feet tall, 230 pounds, with
short hair.

Detective Ermatinger
testified that the deceased=s parents told him that Jason had threatened to kill the
deceased and that a man named Derek witnessed it, but that he had never been
able to substantiate that information. 
He testified that Keith and Kevin told him that it was Jason=s idea but that Jason stayed with
the car when the offense was committed. 
He testified that Jason told him that Jason Athought they were going to jack
[the deceased] or break into his house,@ and that Athey@ meant Appellant, Keith, and two
other guys.  He testified that he had no
evidence that Jason had entered the apartment, that Jason is Caucasian, that it
was stated that Jason asked if, in the melee, Ahis girl@ got shot, and that his girl was
one of the Jones sisters.  Officer Della
testified that the radio call about the shooting Adescribed three black males in a
light‑colored vehicle.@  Keith testified
that he thought Jason=s car was a white Acura.





[7]Most of Appellant=s arguments discussing the facts of
this case involve assertions that the eyewitnesses= testimony was Anot plausible@ or Aobjectively believable.@ 
However, the jury had the opportunity to evaluate the witnesses= testimony and to weigh all of the
evidence presented before it, and we may not simply substitute our judgment for
that of the jury.  See Johnson, 23
S.W.3d at 12.





[8]Appellant objected to Exhibits
38-41, 44, 47, 50, 52, 54-66 at trial.





[9]Dr. Rohr testified that the
numbering he gave the wounds had nothing to do with the sequence in which they
were sustained.





[10]Appellant does not actually discuss
Exhibits 38 and 39, other than to state that Dr. Rohr was Aprobably reviewing Exhibits 36
through 39@ in his discussion of Exhibit 36.